Okay, whenever you're ready. Thank you. Good morning, Your Honors. Charles Piven appearing on behalf of Andrey Slomnitsky and the putative class. On January 18th, Caldwell was clear that Allied was very, very good at predicting how much gold is produced. Buchan confirmed the quality of the ore was known, so production numbers were a simple mathematical calculation. X grams of gold per ton of ore, Y tons put on Lewis, and with normal leaching yielding Z percent of that gold, there was no speculation, no whims of customers, no competitors. They were not factors. The only wild card here was that the leaching was not occurring due to blinding. In 2012, with the increased mining, blinding became Allied's biggest obstacle to achieving production. After Buffington and Buchan made a deep dive into how this came about, they blamed and fired Caldwell. There is no plausible scenario where all four defendants did not know of the blinding by January when the first Could you help me out before you get too far? I'm glad to. The blinding, can you describe just what it is? Blinding, it's like an umbrella. You have lime. Imagine a truck that's the size of this room, and the belly of the truck opens and dumps the entire contents of the lime on top of this pile of ore that's hundreds of feet high. They then drip on top of it, the solution, and because it's dripping, imagine that it becomes like concrete, like a slurry, like a clay. And now it's an umbrella. And then they dump more ore on top of that. And they expect that when they put the leaching solution, which only works by gravity, they put the leaching solution on top, and it hits this umbrella-like barrier. And that's why, if you've read the record, and I'm sure you have, you've read about how it horizontally moved to the side and came down the slopes, because it couldn't go down by gravity like it's supposed to. The leaching solution, it works by capillary action. The ore is porous. And so they drip it because if they just pour it on, it'll bypass the ore. So they drip it. It catches the side of the ore, soaks into the ore, and then it pulls out the gold through a chemical process and then continues its way down to the liner that's hundreds of feet below the top of the pad and goes down because of a slope to a collection ditch. And then the collection ditch has what's called pregnant solution. And the pregnant solution is of a certain grade. They know what the grade should be, which is what I'm trying to explain, because they know how much gold is in the ore. They know exactly what's going to happen. They know how much gold is extracted through this process, assuming it's doing what it's supposed to do. But if the leaching solution cannot reach the ore, it can't extract it, so the ore is dry. What I'm not clear on, trying to visualize, is this all taking place underground? No, no, no. This is a huge 12 million square foot pad that has ore piled hundreds of feet high. And the ore is huge. This is not crushed ore. This is what they call run-of-the-mine ore. So it's huge chunks of ore that are supposed to have been coated with lime to begin with, but they weren't because they were increasing the mining rates so much so that they had to do this thing that was the biggest problem. They belly dumped this lime on top, causing this umbrella, and created all this dry ore. And so the dry ore, if it's dry, you're never getting the gold out, and if you're not getting the gold out, you can't meet your production numbers. And can I ask you this blinding condition that you've described? Is it basically once you've screwed up that badly, you can't fix it? You can't. There's only one way to fix it, and they did. At the end of the day, they finally succumbed to this 15-year-old solution of drilling cores. And they're drilling the cores hundreds of feet deep, and they get the core out, and they can see now where this lime is and where the dry ore is. Then they create these metal tubes, and they put the holes in the tubes where the dry ore is, and then they pressure inject the solution in to now get to that and then bring it down. And that's exactly what they did. And it wasn't a new solution, and it was really— Is this all done to this massive pile of ore that's sitting there? Yes, and it's done over millions of square feet. So you're talking about with the initial test, this letter that we talk about time and time again, was the initial 15 wells on Lewis that ultimately was 27, and it ultimately took two years. So you can imagine how many wells and how much injection and how many permits. And it was a massive, massive effort. And their decision to try and pour leaching solution on top of this in the first quarter of 2013, it was a no-brainer. It was never going to work. It's an umbrella. You're not going to permeate that umbrella with solution. But the issue is where they lied in their statements about what they were doing. Yeah, they lied. I mean, if you look at Buffington, on the 1st of May, an analyst asked him— and let me—I don't want to be accurate. So he said—and Buffington, by the way, was responsible for overseeing permitting, so he knew about the letter. And he was asked, what is the biggest risk to Allied not meeting 2013 production? His response was a bogus explanation that never mentioned the letter that was going out the next day that he knew about, never mentioned the drilling and injection program, never mentioned the blinding, never mentioned the dry ore. This was in the face of a direct question. He lied by omission, straight out. But they said basically throughout the class period that—I mean, they were disclosing that we have problems. No. They never— What you say they never said was that the problem was blinding. That's my understanding of your theory of the case. The theory of the case is they never said that there was dry ore from which they could not extract the gold in order to meet their production numbers caused by blinding. They kept saying, well, it's solution application. Well, solution application is a very simple process of drip, drip, drip, drip, drip. That's all solution application is. Solution breakthrough is when this dripped solution comes all the way down through the ore after saturating the ore and then pulling out the gold and going down to the pad. And they said in the beginning of the class period, Caldwell said straight out, no hesitation, we saw solution breakthrough as expected on Lewis and we saw excellent solution grades. That means Lewis was operating properly on January 18th. Lewis was the only source of the problem at the end of the class period. It was never operating properly. There were 70,000 ounces of gold. And you have to understand, a ton of ore may have a few grams of gold. So we're talking 28 grams per ounce. And so it's a massive amount of ore that it takes. But they had 70,000 ounces of gold that was in dry ore that they never mentioned once until July 22nd. And they never explained that we have no idea how long it's going to take to get it out of the ore and produce this gold until August 5th or 6th. Well, and that disclosure, I guess, if that's what you called where the fraud was disclosed, I mean, they don't actually say anything about blinding, if I remember. They don't. But they didn't in order for there to be a loss causation here, the investors already knew. Now, once they are told we can't meet our production, and by the way, this mill that we're building that's going to expand and allow us to meet these numbers in the future, it's not going to happen. And that's the first time investors know. So they don't know about blinding. They never, by the way, to this day, they've never disclosed the blinding. The only way we know about the blinding is because 13 out of 15 former employees who self-corroborate have explained this process in detail and said this is something that's happening since 2012. I was in a meeting with Buffington in February where this was discussed. I don't remember any of the confidential witnesses saying blinding was known as of X date within the class period. Well, we know that one person, and I forget which one, left in April 2013. He had been there, and he said that blinding had been going on for a long time. If you look at, and this is not in the record, but at ER 234 and 356, the dry ore was ore that had been put on the pad in the third and fourth quarter of 2012. The miss of the fourth quarter production numbers was announced January 18, 2013. So the blinding all happened in 2012, and it was a problem they knew about on January 18 for sure because this is a mechanical process. Nobody's questioning that the ore, and Buchan said the ore body is known.  We know how to test that. You're not disputing that. You're just saying that they didn't disclose that it was going to be much more difficult to extract the grain. Right. But I guess I come back to my point that they did disclose from the outset of the class period that we are experiencing difficulties. Not on Lewis. On Lewis, they said we're seeing breakthrough as expected, and we're seeing excellent solution rates. That's what they said. Give me the date for that statement. That's January 18. That's during the conference call, and that was Caldwell who made that statement. Okay. But then very soon after that. They never mentioned Lewis again by name with regard to this issue until July 22nd. Not once. Not once. I don't know. That's not consistent with my reference. They only mentioned PADS, never Lewis. Yeah, but they are making reference throughout. Maybe you're right about that initial statement, but from then on I remember multiple statements in which they're saying we're experiencing problems. We think we're going to get a handle on this quickly. I grant you that. They're not saying that this is going to take years, but there's nothing that says that they knew at the time that they made each of those statements that, in fact, they already were able to tell that this is not going to be as easy as we think. So what they said at the end was we saw more dry ore than we expected, which means they expected that there was dry ore. They said it was severe the entire time. But they said at the end when they finally got the core samples, it's more severe than we expected. Excuse me one minute. They said it's more severe than expected. And that is indeed. So they always knew the entire time how bad it was. They fired Caldwell for this. I mean, they fired this guy who was responsible for putting this mine in operation over a period of years. That's not a small thing to do that. I'm not sure how much time I have, but I'd like to save some for you. You should probably stop now. You have two and a half, a little over two and a half for rebuttal. Okay. Let's hear from counsel for the defendants. Yes. Good morning. My name is Laura Oswald. I'm here on behalf of the appellees, Mr. Caldwell, Mr. Buchan, Mr. Buffington, and Mr. Jones. And I must say that this is a very unusual claim for securities fraud. In this case, as the Court has already noted, we began the period with the company saying, after having missed its projections for the end of 2012, I mean, it's not good. So they started out the class period disclosing that they were having a lot of problems. And throughout the class period. I'm just looking at, I think this is the January 18 press release. And the statement I'm looking at says, we are confident that the challenges we have encountered with the heap leach operation, if I pronounced that correctly, are short-term in nature. And we are pleased to see the operation is moving in the right direction. That's sort of. And they were talking about the Lewis path. That's right, Your Honor. They did. They expressed confidence. And you'll see that throughout the class period. Expressions of confidence are not the basis for a securities fraud claim, particularly in the absence of any allegation of knowledge on behalf of any of the appellees that they knew the facts to be different or that they knew that their confidence was unwarranted. So, okay. Say that again. Expressions of confidence are not the basis, properly the basis, for a securities fraud claim. Absent allegations, particularly absent allegations that the appellees, the people making the statements here, knew that their statements were false at the time that they were made. That is a ruling of the lower court on puffery. That ruling was not challenged or not raised by the appellants in their brief. Yeah, okay. I mean, right. We're not talking puffery. But we are talking about representing to the investing public that, for example, we are confident that the challenges are short-term in nature and we've got a handle on this. Obviously, if you knew at that moment that, oh, my God, we've made a colossal mistake, this is going to take years to unravel and we're never going to get this gold out, not in this quarter, not for the entire year, and you don't disclose that, obviously you would face liability for that. So that's their theory that you all knew way earlier in the process, that we have this massive blinding problem that we ourselves created and there's only one way to fix it and it's going to take forever to do that. Right? So that's what I think you have to respond to. That's their theory. There is no specific allegation of knowledge on behalf of any of these respondents. That's what mystifies me is how this becomes a pleading case. Because if I understand the gist of what is pled here is that it was obvious for somebody going on property that there's a real big problem here. And they were saying that this isn't a problem and they were inducing investors to invest based on what was essentially false representations. I mean, that's kind of the gist of it. And so what is it that isn't pled that they couldn't plead that is deficient? They need to plead the defendant's appellee's scienter with specificity. It is not sufficient to just say that it is obvious, that it's something called the core operations theory, and that is permitted as a basis for pleading only in extraordinary circumstances and where there is some basis to say that it must be obvious. And how do we know? Looking at the pleading, that it's not obvious here is that the confidential witnesses, of which there were many, gave a wide variety of explanations for the problems. So we heard the appellants get up and explain that everybody knew that this was blinding. When you look at what the confidential witnesses actually said about what they thought the problems were at various points in time, some during the class period, some before, they said things attributed to too much lime, some attributed it to too little lime, some attributed it to problems with delivering the solution, which as I'll get into, the company disclosed throughout the class period that it was having issues delivering the solution. Some of the confidential witnesses said there was too much water. Some said there were too little water. Some said that there was too little water. The fact that it adds up to one conclusion is just an assumption by the appellants here that is based on no fact, no confidential witness, nothing in this pleading says that those facts, those disparate facts, all lead to one conclusion. In February of 2013, they issued a press release with their form 10-K, in which Corwell represented that with the completion of the Lewis leach pad, we were able to increase our tons placed on the leach pads by 77 percent and well positioned to achieve our 2013 guidance. That is true. Nobody disputes that that was false at the time. And that, in fact, is one of the problems that the confidential witnesses point to, was that they had, as appellants counsel explained, added loads of ore. They greatly increased the rate at which they were adding ore to the pad. That was all true. And when you do that mathematically, you expect that if the leaching works as you expect it, you will get the gold recovery out of that pad. So it's essentially like an inventory that's sitting on the pad. The problem was, and what one of the confidential witnesses or several of the confidential witnesses say was the problem,  and then when they applied the solution in the wrong way, the recoveries didn't happen. And the company disclosed those struggles throughout the class period. They disclosed struggles with respect to solution on February 25th. On April 9th, specifically, sorry, April 9th, says that solution is the biggest problem. And maybe these statements aren't tied to every pad, but these are statements regarding the operations generally. And then when we get to April- Again, in a conference call on February 25th, Caldwell says, we're starting to get our solution flows back up and production is looking pretty good. That's right, because they were. They were putting more solution on the pad. Nobody disputes that that, nobody said that that wasn't true. The issue was it wasn't breaking through and they couldn't figure out why. And when we get to April 30th- And when did they disclose that? They disclosed it throughout the class period, that it was taking longer than they expected, but they remained hopeful. So the solution, the problem was they were putting all this stuff on top, but the solution wasn't getting through. When did they disclose that? They disclosed it as an issue specifically with respect to the Lewis pad on April 30th. And that conference call, Mr. Buffington stated, what we're focused on right now is getting the cyanide to the ore by getting the pH up where we can carry more cyanide in the solution at the depths that we're seeing on the brimstone and the Lewis pad right now. They're quite high, 200 foot plus in most areas right now. So some of those deeper secondary and tertiary recovery areas that we would like to target is where we're trying to get higher pH to carry that cyanide deeper into the pad. And this, again, would directly address the purpose of the drilling program that appellants argue was the source of some sort of fraud. But the purpose of it was disclosed by Mr. Buffington. And when did they know what they disclosed that you just said? What they knew and what the confidential witnesses say that they knew or when they knew was in June, July, and August as the results of the drilling came back. What about the allegation concerning the second amendment complaint, it's FE1, right, the person whose tenure ended in April of 2013? That person, of course, says it had been known for a long time that blinding was an issue on the Lewis pad. Obviously, that person's knowledge, I assume, has to predate April of 2013 when they left, right? So why isn't that enough to at least advance the case forward? Confidential witness one says nothing about the knowledge of the defendants of the appellees here. We have no allegation of cyanter. If that is the cause, and as we've said, what we see in the confidential witness statements is that there were a variety of opinions of what the cause could be. I don't remember what FE1's position within the company was, but I assume that person wouldn't have greater knowledge of a catastrophe as great as blinding within the company than the executives who the plaintiffs have sued. I think that's a wrong assumption. I also think that does not correctly state the law. The plaintiffs have to allege specifically that the defendants were aware of this condition. And, of course, people that are working on the mine site day to day will have different observations. As we've seen, they did have different observations, have different theories. This one confidential witness who left early on in the process says, of course it was blinding. Other of these 15 confidential witnesses say other things. They're allegations about why that you can't, under the securities laws, you cannot make the assumption that these appellees would have known. That is not the standard. The standard is it has to be specifically pled as to each and every one of them why they would know. An assumption about... Again, to get back to the conference call, Caldwell noted we're starting to get our solution flows back up, and production is looking pretty good. He must have known what was causing the delay in the solution flows if they're starting to get them back up, which may or may not have been true. Again, Your Honor, the solution flows were back up. The solution, they were pumping more solution onto this huge, massive pad. It wasn't getting through. It wasn't getting through. And the statement... So what's a solution flow? That's how they drip the solution into the pad. So you have the ore, and then you put the solution onto the ore, and then you expect it to percolate through and deliver the gold as counsel described. So you can put more ore on the pad. You can put more lime on the pad. And so you don't think that when they say that they're putting more on, you say, well, that's accurate. That is accurate. And they say, well, they knew that it wasn't getting through, and they didn't disclose that. They have no specific allegation that we knew that it wasn't getting through. What they allege as to these appellees, and I think it's important to note, is nothing with respect to Caldwell & Jones other than their experience in the industry and their tenure with the company. With respect to Mr. Buffington... Well, why isn't that significant? It's not sufficient under the securities laws. Under the securities laws, your general experience is not sufficient. You must specifically plead scienter, the appellee's knowledge, as to the specific misstatements at issue here. It is not sufficient to plead generally. So your view is that if, for example, this FE1 person had been alleged to say, in April of 2013, I was in a meeting with the defendants at which it was discussed that blinding is just causing us all sorts of headaches. I gather you'd say that's sufficient, but what they've given us isn't specific enough. And scienter has to be considered in the context of the entire complaint. So certainly if he said that, and he said it with specifics about when that meeting was, what was discussed, that would be enough. It has to be a subjective allegation specific to the person as to when and where, and not that anybody walking on with this person's experience would see that there's no gold coming out because there's too much, because the stuff isn't getting through. That's exactly right. That is the longstanding law of the Ninth Circuit and the U.S. on scienter. And even in cases where these sorts of meetings are alleged, they have to leverage that as to everyone, and it has to be the most cogent and compelling inference that you would draw from all of those specifics. Here, in a case where we have zero specifics, there's no contest. There's no comparison of the most cogent and compelling under TLABS. There is only an absence of scienter. And here, what the plaintiffs have alleged, even with respect to Mr. Buffington and Mr. Buchan, who are the only of the appellees that warranted any discussion, was that Mr. Buffington moved to the site. And Your Honor made a comment about, well, if they're at this mining site and they're seeing what happened, listen to the description of how this is a 1,200-meter square pad that stretched 200 feet high. This is not something where a person can walk around, observe it, and a look and say, here's the problem. And again, that's exactly what the confidential witnesses in this case indicated, that they all saw different things. Because you're observing a huge mass that you can't see the interior of. It's 200 feet high. So there's no basis to say that that's evidence of scienter or a pleading of scienter. They allege that he spoke to people on a daily basis about what? About this issue? About blinding? Not alleged. They contradict on whether or not he was attending production meetings. Some FE3 says he was there. FE8 says he attended when he first joined the company. FE6 said that he attended the daily meetings but makes no mention of Mr. Buffington being there. And with respect to Mr. Buckin, all they said was that he pulled the strings along. That's just not sufficient under Ninth Circuit law. The, as I said before. You're over your time, but can you sort of wrap up with whatever the most significant points you want to end on? Sure. So the most significant points here are, Your Honor, that there is no alleged fraud. There is no alleged actionable misstatement that plaintiffs have alleged to have been untrue at the time that it was made. These optimistic statements regarding the hopeful production, the wish, the expectation, those are all inactual misstatements under the, or inactual statements, excuse me, under the PSLRA, under the forward-looking statement doctrine and as puffery. That is a ruling of the district court that the appellants did not raise in their opening brief. It has been waived, and that is dispositive here. What about their desire to file an amended complaint? Your Honor, that also was not raised in their opening brief and so should be waived, but it was also properly decided under the standard of an abuse of discretion here. The district court provided a very detailed order and explained what it was that the appellants needed to improve upon in order to state a claim. They had about a year to do so. They didn't do it. In her order, or in his order, the district judge explained why it was that it was futile for them to plead again, and why was it futile? Because they have now effectively pleaded themselves out of a claim. They have pleaded all the statements that were supposedly false and no basis on which to claim that those statements were false, and nothing in the financial or nothing from the confidential witnesses' contradictory statements could ever be done to cure that fault. Thank you. Roberts. First, the statement that solution application is the biggest problem is silly. Solution application has nothing to do with it if it can't get through. You can put all the water solution you want, it's not getting through. FE8, paragraph 98 of the complaint. During his tenure at the mine, it was an ongoing daily struggle to try to deal with the way the leach pad was draining. There was a lot of dry areas on the pad because of the way the ore was loaded. The permeation of the leaching solution through all the ore was a problem because of blinding. He stated that he learned of this issue with the Lewis pad. At daily meetings he attended where there were discussions, like a roundtable discussion, they were going to do to see where the problems were and how they were going to deal with them. He stated that these meetings included part of the project team and that included FE8 and the plant manager, the production manager, and Buffington when he first arrived at the company, which was February. The two paragraphs that you just read from, even though they place one of the defendants in the meetings, says anything about, and we concluded that blinding was a problem and this was going to take forever to fix. No, that's all he – oh, forget the word right now. That's what I'm saying. All he says is that, yeah, I was at meetings where we continued discussions. There were problems. We can't get the gold out. But that's what they were disclosing to the public. They discussed blinding in February. Okay, blinding in February. I'm looking at paragraphs 98 and 99. It says state of the permeation of solution through all the order was a problem because of blinding. That's the permeation. That's what prevents the permeation is the blinding. So he's saying this is what we discussed at this meeting. That's in paragraph 98. The paragraph 99 is where the person says he was in meetings and there's no discussion of blinding being a problem. Right. To see how they were going to – oh. Right. I'm just saying that that's the whole position, right, that you've got these witnesses who are saying, oh, everybody knew that blinding was the problem. Well, I believe that this – perhaps it's inartful, but I believe that's what this says. And so if it's inartful, then I guess that's my bad. So – but I'd like to address this notion. How would you amend your complaint if you got that wrong? I guess I would make it much more explicit. That blinding was discussed at this particular meeting? That blinding was discussed at that particular meeting. I see. Yes, I would. And I also know that they knew right away – because solution breakthrough, when you see how much gold is in the solution at the end of the day, that happens in days, not weeks or months. So they're putting all this solution on the pad for the first quarter of 2013, yet they knew very quickly when they saw the quality of the solution that was in the collection ditch that it wasn't – didn't have the gold content that they expected. So they knew that. And that's why Defendant Jones, who was the CFO, booked the ore, the gold that was on the pad. They knew how much gold was on the pad. They booked it as, quote, on the pad instead of in the production numbers because they couldn't get to it, and they knew that quickly. Okay. Last point, because you are over your time as well. So that is my last point? No, your last point. You have an opportunity to give us your last point. Okay.  So pick – that's what I'm saying. I'm going to pick very carefully. We've got one more. Well, I guess what I would say is that Caldwell, in no uncertain terms, and I think Judge Corman was honing in on it, he said, things are looking good in January, that we saw solution breakthrough on Lewis as expected, and we saw solution grades that were excellent. That's not possible given the circumstances and given what happened at the end of the class period. It's just not possible. It was a straight-out affirmative lie, as was the April 8th and April 9th statements by Buchan when he said, the mine is starting to – is starting to operate properly. It wasn't. Thank you, counsel. Thank you. The case just argued is submitted. We are in recess until tomorrow.
judges: Schroeder, Watford, Korman